Hemmis, Appellant, vs. Consolidated Water Power & Paper Company, Respondent.

*February 9—March 8, 1921.*

Deeds: Construction: Reservation of flowage rights: Adverse possession: Use not inconsistent with easement.

1. If there is ambiguity as to the descriptive part of a deed, the court may consider the surrounding circumstances to ascertain the meaning of the instrument; but where the intent of the grantor is clearly expressed, the deed cannot be changed by evidence of extrinsic circumstances.
2. In construing deeds, every word and clause is to be taken into consideration.
3. A deed reserving to the grantor the "use of all of the water power, water flowage and dam privilege forever," is *held* to preclude the grantee from recovering from the grantor's assignee damages for overflow caused by a dam situated below the land conveyed.

4. A reservation clause in a deed being in effect a grant by the grantee should be construed most favorably to the original grantor.

5. The use of land for pasturage for eight or nine years and thereafter for no other use than to cut wood and trees is not an adverse user for twenty years such as to deprive the owner of an easement entitling him to use the land for water flowage, such use of the land not being inconsistent with the easement.

APPEAL from a judgment of the circuit court for Portage county: BYRON B. PARK, Circuit Judge. *Affirmed.*

*A. L. Smongeski* of Stevens Point, for the appellant.

For the respondent there was a brief by *Goggins, Brazeau & Goggins* of Wisconsin Rapids, and oral argument by *Theo. W. Brazeau.*

JONES, J.    This action is for trespass for flooding the plaintiff's lands by a dam located at Biron, six or seven miles below the land in question.   Plaintiff owns three tracts which may be designated as lots 1, 2, and 3.   It is claimed that about six acres in lot 1, about twelve acres in lot 2, and about fifty-three acres in lot 3 were affected by flowage caused by defendant's dam.   Since 1914 the dam has been raised from time to time.   The present height is about nineteen feet and it is proposed to increase the height to twenty-one feet.   It was agreed that for the purpose of the trial the jury should assess the plaintiff's future damages with the water held at defendant's dam at that height.   In their special verdict the jury found that the plaintiff sustained no damages as to lots 1 and 2 by the raising of the dam, and that neither of said lots would be flooded by raising the dam to maintain a head of twenty-one feet, and that there would be no damage to the remainder of plaintiff's farm by the contemplated raising of the dam.   They found that plaintiff sustained damages as to lot 3 by raising the dam in 1916 in the sum of $300; that 43.4 acres of this lot would be flooded by raising the dam to the height of twenty-one feet; that the pres-

ent market value of the land so to be flooded is $35 per acre; and that there would be no depreciation of the remainder of plaintiff's farm by reason of such taking.

We shall first consider the claim for damages as to descriptions 1 and 2, since a wholly different defense is pleaded as to description number 3. It is undisputed that lots 1 and 2 were low and had always been swampy; that water flowed upon them from adjacent higher land and from springs. The contour map introduced in evidence showed their average elevation above the bottom of the flume at the dam to be about twenty-eight feet.

It was claimed by respondent that the testimony showed that when the dam is raised to twenty-one feet it would leave the land on lots 1 and 2 six feet or more above the water level. The appellant claimed that it would be somewhat less. It seems clear that the land is of little or no value unless it can be drained. There was a clear conflict of evidence on this subject, some of the evidence tending to show that drainage would be practicable after the raising of the dam. Although the trial seems to have been fairly conducted, the jury found against the plaintiff on the issues raised as to these two lots. We cannot say that there was any such want of credible evidence in support of the verdict that the verdict should be set aside.

Most of the testimony and most of appellant's argument related to lot 3. On February 18, 1896, one J. P. Malick conveyed this lot to the appellant, and the deed contained this clause: "Excepting and reserving for myself and my assigns the use of all of the water power, water flowage and dam privilege forever." It was stipulated at the trial that the defendant, *Consolidated Water Power & Paper Company*, was at the time of the commencement of this action owner of all the rights reserved by J. P. Malick to the water power, water flowage and dam privileges.

Although on the face of the verdict the plaintiff was entitled to a judgment for the damages found, the trial court

Hemmis v. Consolidated W. P. & P. Co. 173 Wis. 518.

held that he was precluded from a recovery by the reservation clause in his deed, and judgment was rendered for the respondent dismissing the complaint. Plaintiff's counsel argue that the reservation clause above quoted conferred no right to flow any part of his land except by a dam erected at or near the premises conveyed; that the real meaning of the clause is that a water-power and dam privilege only were reserved.

Evidence was received to show that near the premises in question there were rapids and a fall in the river of about four feet in a distance of about three fourths of a mile, and that at one time there had been a survey to ascertain how much head could be developed. It was suggested that a head of twelve feet could have been developed, but this would have flowed all of the plaintiff's land. The trial judge expressed the view that a right to build a dam at this place would be of no value to any one.

We recognize the rule that if there is ambiguity as to the descriptive part of a deed the court may consider the surrounding circumstances to ascertain the meaning of the instrument. But it is also the rule that where the intent is clearly expressed it cannot be changed by evidence of extrinsic circumstances. It is also a familiar rule that in construing deeds every word and clause is to be taken into consideration.

As we construe the deed, the grantor reserved to himself and his assigns not only the water-power and dam privilege but also "water flowage." There is no language of limitation or restriction as to the time or place of exercising the right to build a dam or to cause the flowage.

Appellant's counsel argue that the right to build a dam and the right to flow are inseparable and that the reservation gave no right to flow his land except by a dam on or near the land conveyed, but the authorities do not seem to support this claim. It does not appear that the dam as built or contemplated will cause any greater flow of water on plaintiff's

land than would be caused by a dam nearer his premises. In the absence of any restriction or limitation the reservation should be given its natural interpretation, not confining the grantor and his assigns to the location of the dam to any particular place. Gould, Waters, § 304; *De Witt v. Harvey,* 4 Gray, 486; *Bradley v. Warner,* 21 R. I. 36, 41 Atl. 564; *Kilgore v. Hascall,* 21 Mich. 502.

It is claimed by the appellant that the reservation clause in the deed should be construed against the grantor; but in *Green Bay & M. C. Co. v. Hewitt,* 66 Wis. 461, 465, 29 N. W. 237, Mr. Justice ORTON said: "If there is a reservation in the deed, it being in effect a grant by the grantee, it should be construed most favorably to the original grantor," and there is much authority for this view. 2 Devlin, Real Estate (3d ed.) § 979.

Appellant's counsel claim that if respondent ever had a right to flow this land with its dam the right was lost by the adverse user by the appellant for twenty years. Bearing on this subject the appellant testified:

"When I got the place it was low and swampy; it was not swampy, it was wet. Wet on the south of lot 3. We call it a swamp at home for a by-word. It was known as a swamp; we called it that way. Shortly after I got it I put a fence around it, running way to the river. I pastured it; I had a cow mired in there. And eight or nine years after I bought it I tore down the fence, and I have never pastured it since or tried to put a fence up there since. I never put a fence around the other part of my land, the low land in the northeast of the southeast and the northwest of the southeast. I quit using all of that low land as a pasture and never used it since as such. I never put a plow on the land. I have never raised any agricultural produce of any kind. The only use I have ever made of the land at all in any way is to go down there and cut wood and trees and pasture. I quit pasturing shortly after I tried it; after I had the cow mired. The cow was mired about eleven or twelve years after I had it, something like that; anyhow it was before the defendant, *Consolidated Water Power & Paper Company,* flowed the land."

There was nothing in this kind of use of the land which was inconsistent with the easement claimed by respondent. So long as the defendant and its predecessors in title did not exercise the right of flowage they were at liberty to use the land for that purpose. The owner of the fee had the right to use the land as he did. Such user was no notice to defendant that it could not have the benefit of the easement when needed and was not hostile. *Butterfield v. Reed,* 160 Mass. 361, 35 N. E. 1129; *Roberts v. Sioux City & P. R. Co.* 73 Neb. 8, 102 N. W. 60; *Chicago, M. & St. P. R. Co. v. Snyder,* 120 Iowa, 532, 95 N. W. 183.

*By the Court.*—Judgment affirmed.

ESCHWEILER, J., dissents.